Bill, Ms. Merriweather. May it please the Court, my name is Ellen Merriweather from the law firm Cafferty Fauchet here in Philadelphia, and on behalf of plaintiffs' appellants, I will be presenting argument on the antitrust issues before the Court today in both appeals. My colleague, Joe Watley of Watley, Drake & Kallis, will be addressing the RICO issues. Of my 20 allotted minutes, I was hoping to reserve 6 for rebuttal. And I wanted to verify with the Court that if I do so, Mr. Watley will also be able to reserve time for rebuttal as well. Thank you, Your Honor. This Court should reverse the decision of the Court below for three reasons. First, the Court below misapplied Twombly and the legal standards governing a motion to dismiss. It eschewed any obligation to view the facts in the light most favorable to the plaintiff and determined that the complaint should be dismissed because, in its view, the facts alleged did not necessarily amount to a horizontal conspiracy. Second, antitrust jurisprudence in the Supreme Court, and particularly in this circuit, compels the conclusion that an inference of conspiracy permissibly and plausibly arises from the facts alleged here. And third, if the allegations of the complaint are proven, they prove a horizontal agreement among competitors to reduce or eliminate competition among them. That is a naked restraint of trade and a per se violation of the antitrust laws and should be summarily condemned. It bears repeating that the District Court dismissed all of the antitrust claims in this case under Rule 12b-6. Following this Court's directives in Phillips, Judge Brown was required to accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiffs, and to determine whether under any reasonable reading of the complaint, plaintiffs may be entitled to relief. In the post-Wombly era, Your Honor, the question for the Court below and for this Court was whether the facts alleged plausibly suggest any of the horizontal conspiracies alleged in the complaint. Why don't you break down your claims for us so that we can examine them? Your Honor, although cases in the 12b-6 context don't give factual context for hearings, the cases in the summary judgment context in this circuit do provide some guidance because they have been directed to the issue of what facts, if proven, are sufficient to plausibly suggest a conspiracy so that the case may be put to the jury. Petruzzi's is one of those cases. And in that case, Judge Greenberg, you held that when there is direct or circumstantial evidence of a conspiracy, and the inferences under Matsusha of whether the conspiracy is plausible do not arise. In this case, in Counts 1 and 2 of the commercial complaint, which alleged the Marsh Broker Center conspiracy, there is direct evidence of a conspiracy among the participants not to compete for each other's incumbent business. The direct evidence exists by way of admissions, not only by Marsh, but also by insurers as to what the Marsh plan was, what the scheme was. One of the insurers characterized it as a scheme where it was very important that the insurers not compete. And in return for that, their business was protected by Marsh from competition from other insurers. One of the insurers called it an incumbent protection racket, and observed that it was great when you were the one being protected, but it created a barrier to entry when you were on the outside looking in. In the Marsh Broker Center conspiracies, there is direct and strong circumstantial evidence of an agreement among the participants not to compete with one another. Which participants are you referring to? The... The insurer defendants? Yes, the broker and the... Or the brokers with the insurer defendants. The conspiracy is among the brokers and the various insurer defendants. And the scheme was this. The scheme was that the broker and the insurers agree with each other that they would not compete for the incumbent business of the other. That the Marsh-controlled book of business would be allocated among the insurer defendants, and that those defendants would be protected from competition from each other for the incumbent business of the insurers. That was the scheme that was alleged. And in fact, Judge Brown recognized that plaintiffs had pled a panoply of facts that suggested that the insurers bid certain things, like give first and last looks, in some cases give protective bids, or not bid for business, in order that their incumbent business be protected. That's what Judge Brown said when he characterized the allegations of the complaint. He said, plaintiffs also offer facts which suggest that the insurer defendants understood that if they complied with the broker's demands, then their business would be protected upon renewal. So there was agreement between brokers and the insurers. Where was the agreement between the insurers? Your Honor, to the extent an insurer agrees to do something, in order that other insurers don't get an opportunity of this business, I believe that that clearly amounts to a horizontal conspiracy. Well, are you saying that you've alleged that if one insurance company got a request, supposedly insured, specifically asked Marsh or someone else, some other broker, why don't you see what rate you can get from the XYZ company? The XYZ company, if somebody else had that business, would give a lousy rate? Your Honor, in the Marsh Broker Center conspiracy, there was specific evidence that, indeed, fake bids were collected from rival insurers in order to make the bid of the targeted insurer more attractive. And there are allegations of fact... The targeted insurer, do you mean the selected insurer? The selected incumbent, yes, that's right. Are you saying that you can show that the insurance companies made up bids that they knew could not be successful? They knew that they were not the winning bid. They were told that this would be a protective bid, and that if they did this, cooperated in the plan, then their incumbent business would be protected in return by other fake bids obtained from other insurers. When I tried to understand this, I was trying to think back to the consumer, because actually I'm a consumer in a lot of business. But with a consumer, there are certain rates that are fixed. And I think, for example, if you're buying auto policies, you really can't negotiate it. I think that there are certain characteristics that go into the policy, where you live and records and all that. Maybe I'm wrong. But is this kind of insurance, you do negotiate on an individual basis? Well, the broker was the client's representative. And the broker, this is commercial property cash, so it's not auto. And it was the broker's job to shop the customer's business among a number of insurers, and then to give that client the option of a number of competing bids, and then that way the client would, through the methods of competition, be able to have the best possible price. And that's the same as if you bought a ton of steel. That's correct. So that the price is not fixed by a rate-fixing agency. That's correct, Your Honor. There isn't any filed rate doctrine implicated in this case. This is a situation where the facts are very clear that particularly, and we haven't gotten to the other conspiracies, but the Marsh Broker Center commercial conspiracies, where the scheme that existed was admitted to not only by Marsh but by the insurers that participated in it. It was a quid pro quo scheme. It was, I'll do this for you if you do this for me. Am I correct that the allegations of bid rigging pertain only to the Marsh conspiracy and maybe to Willis, but to no other? Yes, Your Honor. Am I correct about that? Correct, Your Honor. The specific instances of bid rigging, and there are many in the complaint, occurred with respect to the Marsh Broker Center conspiracies alleged in Account One and Account Two. But, of course, there are many other brokers. There are, and may I get to that? Yes. First, there is direct evidence of a conspiratorial arrangement in the HRH Broker Center conspiracy. There, the complaint alleges specific facts. Was there bid rigging? There was no bid rigging. What it was was a customer allocation scheme where the insurers were informed that there would be three of them, and this is in memos from the insurance companies, so it's not just the broker talking about what it's going to do. It's the insurer writing about what it understands the allocation to be, and that is that the three insurers, the big three, would divide certain segments of HRH's books among them, that there would be no quoting between them, and that their incumbent business would not be switched to one another. It was a pure and simple agreement among the insurers of which they were aware. This is a written memorandum? Yes, Your Honor, and it's alleged in the complaint, and I can get those paragraphs for you. Wouldn't that, in a sense, be bid rigging? Because they agreed that, well, I'm not going to compete against you. Isn't that, in a sense, bid rigging? It could be, Your Honor. I don't have – we haven't alleged that false bids were actually solicited, although certainly – So it would be not bid at all? Is that what you're saying? It would be not bid at all, or – this gets to the other point. How is a horizontal conspiracy reasonably inferred from the facts where there was no bid rigging? And the answer is this. When the insurers paid their contingent commissions, what they were purchasing was protection for competition. There are numerous specific allegations from the insurance companies themselves where they say, we have purchased an unfair competitive advantage. Marsh will give us first and last looks. Our renewal book will not be marketed over and over and over again. Prudential said on the employee benefits broker center conspiracy that the incentive program allows us to take business with no competition and more margin. So what the insurers were buying with their contingent commissions was an allocated amount of premium volume and, most importantly, protection from competition from other insurers. Now here's the next step. The insurers know that there are other partners in these arrangements. Why do they know that? Because the broker made sure all of the insurers knew not only that there were other partners, who those partners were, what they were paying in contingent commissions, and, most importantly, the premium volume that was being delivered on account of those payments. So when the insurer knows that it is buying competitive protections for its incumbent business, and it knows that other insurers are not getting a real opportunity on its incumbent business, and it knows that there are other partners of the broker who have the same competitive protections but with the same contingent commissions, it is a fair inference, I would submit, Your Honor, that this describes a conspiracy, a horizontal conspiracy. There's no other fair inference of this behavior? There could be another fair inference, Your Honor, but we're talking about a motion to dismiss right now, and the question is whether this complaint plausibly suggests a horizontal agreement. It is not, as Judge Brown said, whether a horizontal agreement necessarily would be found by a jury or some fact finder, but whether it could be found. And in a situation where an insurer knows, through the partnership arrangement, that it's not getting an opportunity on other insurers' business, and other insurers aren't getting an opportunity on its business, then I would submit that this is just like, in the words of Interstate Circuit, that they are agreeing to participate in a plan, the natural consequences of which is a restraining order. The scheme that we have alleged is a scheme among a broker and the partners, and they all knew who each other were, that the broker-controlled book of business would be divided among the partners so that each would get its fair share on a competition-reduced or competition-eliminated basis. This is a naked restraint of output among horizontal competitors. It had the effect of raising prices because the contingent commissions paid for the privilege of accessing the broker's book were then funneled back into the formulas that were used to determine premium levels and therefore raised the premium. When the insurers paid those contingent commissions, they paid for protection from competition. So even in those broker-centered conspiracies where there's no direct evidence, Judge Brown was still wrong in dismissing the allegations of the complaint for not necessarily amounting to a horizontal conspiracy. Actually, you see this as a simple appeal even though we've got this number of... I do. Yes, Your Honor, I do. Anything? Just one question. What impact, if any, does the Marsh settlement have? Well, it takes out one of the co-conspirators in the Marsh broker-centered conspiracy. However, except for York, a number of those conspirators remained before the court. And some of them engaged in bid-rate with Marsh. And there's evidence that others purchased competitive protections, expected competitive protections, and participated in this arrangement whereby Marsh's business would be divided among these insurers on a competition-free or competition-reduced basis. So other than taking out, you know, creating the empty chair at trial, the viability of the Marsh broker-centered conspiracy still exists. I gather that we could seem sort of strange, but I gather it could happen that we would reverse a near case and yet uphold the settlement. And the plaintiffs who objected to the settlement, the defendant may say, gee, maybe we shouldn't. The plaintiffs may say maybe we shouldn't have settled. And it could happen. Could be, Your Honor. You reverse with a strong opinion, then the defendants may be begging us to hold on to the settlements that were challenged before the court. I certainly would be happy with a result where you reverse with a strong opinion. Thank you, Your Honor. Thank you, Ms. Merriman. Mr. Wiley. May it please the Court. I'm Joe Wiley on behalf of the plaintiff appellants to address the RICO issues. To pick up on where Ms. Merriman was, in terms of the RICO claim, what we're alleging is that the extent of the contingent commissions was not disclosed, and, in fact, it was concealed, and the defendants did not disclose the fact that the contingent commissions were being built into the premiums and customers were paying hugely increased premiums as a result of the scheme we allege here. And the reason for all that is obvious. For example, if you look at paragraph 430 of our amended complaint, in the commercial case it talks about how AIG inadvertently disclosed the amount of its contingent commissions paid to Accordia, to Accordia's customer, and when Accordia's customer found out the tens of thousands of dollars were being paid in contingent commissions in that instance, the customer immediately demanded a refund because it had also been paying Accordia. And so that's the reason they had every incentive to keep this concealed, and the only way the scheme would work is if they did. One thing that should be clear is this is a bit of an unusual case. The pleadings in each case are actually set out in three documents. There is a second consolidated amended complaint in the commercial case and the employee benefits case. There is a revised particularized statement that applies to the antitrust claims and sets them out in more detail. And there is a third amended RICO statement that also addresses the RICO claims. The first point I would like to get to, and Judge Greenberg, how this appealed from the RICO standpoint really could be very simple, despite all the paper, is that Judge Brown failed to apply Seville. In Seville, this court had reversed the district court for applying proof standards with respect to an enterprise. Was there a corporation in Seville? There was a corporation. So there was a legal entity that was separate. There was a legal entity just like the CIAB enterprise. Well, CIAB is not the same kind of entity as a corporation, is it? It is, Your Honor, with all due respect. I think it's an unincorporated association. No, I understand that. But you're saying they're identical for purposes of legal analysis. For purposes of the existence of an enterprise, Judge Brown, with respect to the CIAB enterprise, Judge Brown went off on the conduct part of RICO, which I'll get to momentarily. But Seville says you're supposed to identify the enterprises. Clearly we did identify the enterprises. There can't be a dispute about that. Judge Sirica, what you're getting to is here, with respect to the broker-centered enterprises, they are associations, in fact, as opposed to corporations or unincorporated associations or the like. But we set out, if you look, for example, in paragraph 502 of the commercial complaint, we set out, with respect to each broker-centered enterprise, who was involved, each entity. And what the defendants say is, well, you shouldn't apply Seville to this situation because Twomley has come along, and Twomley should change the standards. I should note, and we can provide the sites if you wish, we found at least three opinions from the District of New Jersey that continue to apply Seville in terms of pleading standards for an enterprise since Twomley. Is it possible that we could uphold the court on the C-I-A-B and yet still reverse on the balance of the retail arguments? Yes, Your Honor. I'd be happier if you reversed on all, but yes, you could. Conceptualize what the possible outcomes are. There is a different conceptual issue with respect to the ruling on the broker-centered enterprises in both the commercial case and the employee benefits case than there is with respect to the C-I-A-B enterprise. And so, yes, Your Honor, you could reverse on the first and affirm on the second. We submit you should reverse on both, but there is a different issue with respect to that. Your Honor, the reason, even if Seville didn't apply here, we clearly have alleged all of the elements of an enterprise. And now I'm addressing the broker-centered enterprises. You've got to understand this is a situation, I think, and first to put Twomley in context. This is not a situation where we're simply asking you to infer from circumstantial evidence that there were agreements or that there was illegal conduct. This is a situation where there are lots of criminal pleas. This is a situation where many, many of the defendants have entered into agreements with attorneys general and regulatory bodies admitting their improper conduct and agreeing not to do it anymore. This is not a situation where you have to infer that the defendants did it. This is a situation where they have had former employees plead guilty and admit they did it, where they have entered into agreements with prosecutors admitting they did it. So this is not the Twomley situation where you have to infer impermissible conduct from simply parallel conduct. This is a situation where there is direct evidence and lots of it. What is your argument on the distinctive aspect? How do you distinguish between the enterprise and the business? Your Honor, you distinguish between the enterprise and the pattern of conduct. That's the distinctive question you're asking. I think it's the second requirement after structure. And there, Your Honor, the issue here is the broker defendants were obtaining insurance quotes, obtaining insurance for their customers, and the insurer defendants were making quotes and providing insurance for the various customers, all legitimate activities. That was going on in the context of this. It is very, very similar to the enterprise that was involved in, I may be mispronouncing it, Judge Greenberg's opinion in the Console case. And there you had a law firm that entered into an arrangement with an orthopedic surgeon, and the orthopedic surgeon agreed to refer his patients to the law firm to be clients, the personal injury law firm. And in return, the doctor would submit bogus inflated bills, and the law firm would pay them and deduct them from the personal injury settlements. In that situation, they raised the same question. Where is the distinctiveness in this enterprise, in this arrangement between the doctor and the law firm? And there Judge Greenberg said, speaking for this court, that its difference is the doctor is providing medical services, the law firm is providing legal services. Their activity is distinct from that. The second way there's distinctiveness that's been recognized is when there's an ongoing arrangement, and there are many different activities within the scheme, within each broker-centered enterprise. That in itself can be enough to establish the distinctive requirement, and that's present here. Even if you didn't have the reasoning that Judge Greenberg set out in Console. So it's both of those. Now, it's alleged specifically in paragraph 510 of a commercial complaint. It's alleged in paragraph 532 of the employee benefits complaint. We allege it in response to question 7 on page 69 of the RICO statement in the commercial case, and we allege it in response to page 7 on page 59 in the RICO statement in the employee benefits case. In addition, Your Honors, there are two other requirements for an enterprise. If we're going to apply an increased standard beyond Seville on alleging an enterprise for purposes of a motion to dismiss, there are two other requirements that are there, and those are structure, which we specifically allege in our complaint, in paragraph 502 of the commercial complaint, and paragraph 525 of the employee benefits complaint. We allege the structure that was set up. And finally, there's the issue of whether it's ongoing. And there, we specifically allege that these started in the mid to late 1990s and were continuing. We clearly met that in paragraph 502 of the commercial complaint and in paragraph 523 of the employee benefits complaint. So we clearly, even if you apply the heightened standards, which with all due respect, we submit you should not, even if you apply the heightened standards somehow, instead of Seville, we still should have survived the motion to dismiss. And now let's turn to the CIEB. With respect to the CIEB, what happened was back in April, Judge Brown had issued a motion to dismiss and allowed us to replete. Then he said that we did not allege that the defendants had conducted the affairs of the CIA enterprise through a pattern of racketeering conduct. So we came back, and in paragraph 527 of the amended complaint and the commercial complaint, in the commercial case, similar allegation in the employee benefits case, we specifically allege that. We have specifically alleged it in answer to 6A for the alternate to CIEB enterprise in our amended RICO statement. And we didn't just stop with the bare allegation that they had. If you start at paragraph 512, you'll see that there are allegations that go on in substantial detail about what went on through the CIEB. And finally, if you go back where we're alleging the factual predicates for the RICO claims, if you go back in there, what we're alleging with respect to CIEB, and go from paragraph 444 through 468, there are allegations after allegations about how the defendants used the CIEB to develop inadequate disclosures that helped conceal the extent and the use of the contingent commissions and the fact that they were incorporated into the premiums so that they increased the premiums. And we allege that in very, very great detail. It's the CIEB which also brings together, it is the organization for the brokers, but it also brings together the insurance companies because at the Greenbrier, they bring in what they call the CICE, the Council of Insurance Company Executives, where they all meet jointly. And one of the specific issues that we can even document that they address were contingent commissions and the disclosure of contingent commissions. And they followed in the inadequate disclosures, but by the time of the various attorney general investigations and the agreements, the defendants all admitted, or not all of them, many of them, admitted that these disclosures were inadequate. Those were all done consistent with the standard disclosures that they developed through the CIEB. It's at the heart of what they developed here. It is very much involved in the whole scheme and if the scheme would have never worked if they hadn't had consistent inadequate disclosures that kept the customers in the dark about this because as we allege in the instance when they were inadequate, when they were accidentally disclosed, when somebody found out about these enormous contingent commissions that are being paid directly from the insurer to the broker who's supposed to be acting in the interest of the customer, then immediately the customer knows that his or her or its interest is not being carried out. And that's what was happening here. Now, Your Honor, the issues are substantially the same in the employee benefits area. They are basically two fundamental differences, only one of which really matters for purposes of this appeal. In the employee benefits side, there is no CIEB enterprise. There are only broker-centered enterprises. That's number one. You also have the additional factor of the standardized misrepresentations in the form 5500s that the government requires to be given to plan administrators. And those were falsified. If you have no questions, that's good. We'll have you back on rebuttal. Thank you, Mr. Clark. Thank you very much. Mr. Waxman. May it please the Court. For yet a third time, the District Court has properly dismissed plaintiff's successive complaints in this case. The antitrust claims fail for two independent reasons. First, because the facts pled do not establish a plausible per se violation under Twombly. And second, because in any event, the conduct at issue is the business of insurance that is exempt from federal antitrust laws under McCarran-Ferguson. I'll address RICO as well. And RICO fails for the Twombly reason as well, that is neither the second amended complaint, the revised particularized statement, or the third RICO case statement plausibly alleges a racketeering association in fact or one that was conducted by the defendants. And I'll address CIB finally. But the main problem with CIB is that there is absolutely no allegation whatsoever other than the single conclusory sentence in paragraph 527 that the defendants conducted the CIAB through a pattern of racketeering activity. But if the Court please, I'll address the Sherman Act first, McCarran-Ferguson second, and then RICO, although I'm happy to be disrupted in any way that would be useful. As to the Sherman Act, it is of paramount significance. The most important thing in this case is that the plaintiffs have disclaimed any challenge under the traditional rule of reason. They are relying solely on claims of per se violations. And that means that their case stands or falls completely on whether the facts alleged established that there were horizontal agreements among the insurers that allocated the market, not just horizontal agreements, but horizontal agreements that allocated it in a way in which those insurers could monitor and enforce. Vertical agreements like the contingent commission arrangement that the plaintiffs allege in such detail are never judged under a per se standard. They are always judged under the rule of reason. That is black-letter Supreme Court law, and it dooms the complaint in this case. Of the hundreds and hundreds and hundreds of paragraphs in their complaint and particularized statement, virtually none, I can think of only one, I think it's paragraph 145 in the complaint, even recite a communication between two insurers, much less agreements that are per se unlawful. Their case depends on asking a court to infer that there were horizontal agreements based on what they assert the insurers, quote, knew or understood. But no such inference is permitted for three reasons. Now, I want to lay aside the bid-rigging allegations that are alleged with particularity in the complaint on I think a dozen instances, all of which occurred not just in Marsh, but in Marsh excess casualty. These were all individual acts that are fraud, and true bid-rigging is a per se violation, no doubt about it. They occurred in the office of one broker in one city with one of the 24 lines of insurance that comprise the commercial insurance business, and therefore are fully circumscribed by count two of the complaint, which is the Marsh excess brokerage account. Now, I want to explain in a minute why that count, even that count doesn't allege a bid-rigging conspiracy. They have strategically chosen not to plead the kind of narrow bid-rigging conspiracy that Rule 9 would allow them to charge, because bid-rigging is fraud and it must be pleaded with particularity. But before I, well, let me just, let me stick with bid-rigging and then get it off the table. They have no standing to complain about the bid-rigging instances that are alleged or bid-rigging conduct with respect to Marsh excess casualty, because not only, despite 70 million pages of discovery and 200 depositions, not only have they never alleged that they ever purchased an insurance contract that was the subject of a big rigged bid, they have not even alleged that a single one of them ever bought excess insurance through Marsh or from any of the defendants in this case. And under this circuit, your opinion, Judge Greenberg and Mayo, that is an absolute failure to establish any standing. No, I never knew I wrote so many opinions. I think my colleagues and I have had the opportunity to obtain a fulsome appreciation of the panel's body of work. Moreover, we feel sorry for you. Moreover, even with respect to Count 2, which contains all of the alleged individual instances of bid-rigging, it's not pleaded as a bid-rigging claim. It alleges the same broad market allocation conspiracy that all the other counts in the commercial case and in the employee benefits case involves, that have these conflicting incentive vertical preferred provider arrangements. And I can go in detail. But why wouldn't that be, having been alleged with sufficient particularity, at least be enough to hold the Marsh brokers and the Marsh insureds into this? Well, because, Judge Fischer, with respect to Count 2, the Marsh excess casualty, they aren't alleging, they have quite specifically chosen not to allege that that was a bid-rigging conspiracy. They allege, even with respect to Marsh excess casualty, this sort of broad market allocation distribution involving contingent commission agreements that provide conflicting incentives to brokers. And I can give you the sites, but even with respect to Marsh excess casualty, they show that Marsh was deciding who to award contracts on as a general matter, based on whether there was a contingent commission agreement that was in the first tier, that is the richest for Marsh, or what they call Tier B or Tier C. It alleges instances in which Marsh was taking business away from one incumbent and giving it to another incumbent. It alleges instances in which Marsh was providing its preferred provider's last looks, which this Court has repeatedly said are evidence of competition, not collusion. In short, they could have chosen strategically to bring a bid-rigging conspiracy that encompassed the specific instances of bid-rigging that they found. But they have strategically chosen to plead something, even in Count 2, that is much broader. And Count 2 is, therefore, much like all of the other counts in our case and in the employee benefits case, and it doesn't allow an inference of a horizontal agreement for three reasons. First, under Twombly, parallel behavior is not sufficient to allege a horizontal agreement, unless that behavior would not have been in each conspirator's economic self-interest but for such an agreement. In a per se case, this is not a rule of reason case, in a per se case, the plaintiffs must allege facts that show why a horizontal conspiracy is necessary to explain the parallel conduct rather than what Twombly calls, quote, an obvious alternative explanation. They don't have to prove it at the facts. They don't have to prove that no other conceivable explanation is possible. But they have to allege sufficient facts to disprove an obvious alternative explanation. And in this case, this is a case that's stronger than Twombly, because in this case, the contrary is true. The complaint itself affirmatively sets forth the obvious alternative explanation. And that is the web of hundreds of vertical contingent commission agreements that were created, arrangements that were created by the brokers, each of whom, by the way, is competing against each other. Those contingent commission arrangements, the preferred provider agreements, gave each individual insurer an independent economic interest in becoming a preferred provider, in paying contingent commissions to get brokers to sell its policies, and in accepting the broker's decisions as to the award of the business. This is a plain, flat-out distribution arrangement like so many other businesses where, you know, all the various beer manufacturers are competing with contingent commission agreements to get distributors to push Anheuser-Busch rather than Miller or whatever else. So there is no basis here to infer the horizontal conspiracy from the fact of the vertical contingent commission agreements because there is an obvious alternative explanation. It was in each insurer's interest to become a preferred provider and to pay extra commissions so that they could produce more output, so that they could make more money. And the complaint with respect to each one of these goes through in detail and shows how incredibly profitable, to the insurer participants, these contingent commission agreements were. So this is not a situation at all like, for example, Toys R Us or the Interstate Circuit case that they look to where the court was able to infer a horizontal agreement among suppliers that was instigated by the hub. In that instance, those were cases where it was the film distributors in Interstate Circuit and it was toy manufacturers in Toys R Us where what the court said is they were being asked, the suppliers were being asked to reduce output. They were being asked to sell fewer film tickets. They were being asked to sell fewer toys and limit their distribution outlets. And there is no reason why a manufacturer would choose to reduce its output unless all the others agreed to do so. This is a case, by contrast, in which the individual insurers who participated in these vertical arrangements were increasing their output. They were participating so that they could sell more insurance, and the complaint affirmatively shows that they did so. Now, even if that weren't the case, there's a second and a third reason why you can't infer a horizontal agreement. The second is that the implausibility of any per se horizontal conspiracy is underscored by the complaint's failure to identify any method for allocating the business that the insurers could enforce. It is the sine qua non of any horizontal market allocation agreement that the mechanism be transparent so that conspiring competitors can monitor and enforce it. That was Petruzzi's where there were four bone and fat rendering companies. There was no vertical element to it. They all decided new customers were going to compete, but no one's going to compete or bid for anybody else's customers, and they had a mechanism for enforcing it that was rather vividly described, Judge Greenberg, in your opinion, for the court. Here we have hundreds and hundreds of vertical contingent commission agreements that provided the brokers a hodgepodge of conflicting incentives that gave each broker the ability to play one insurer against the other in order to get the best deal. The complaint itself alleges that some of the contingent commission agreements were keyed on volume. Some were keyed on retention. Some were keyed on growth. Some were keyed on profitability. That is, you give me the richest contracts where the premium will most greatly exceed the loss. And there was even one arrangement, they allege, which was predicated on first come, first serve. The brokers who had those agreements had to make a calculation, how do we do best? Who do we steer the business to, one insurer versus another, based on what they're offering us? And the brokers made the insurers keenly aware of how rich these commission agreements needed to be so that the brokers could make the most money. That is hardly a scheme of market allocation that the insurers could enforce. And finally, under the Sherman Act, even if there were agreements that could have existed among the insurers, they would plainly have been ancillary to the agreements that those insurers had with the brokers. But under the Sherman Act, ever since Judge Taft's decision in Addison Pipe, horizontal restraints that are ancillary to vertical arrangements, in other words, horizontal agreements that exist to facilitate the vertical ones, are judged under the rule of reason which the plaintiffs have disclaimed. I'll say one more thing about the Sherman Act before I move to the other two points, and that's to address the point that Ms. Merriweather mentioned Marsh, which I believe that I've addressed. If the Court has questions, I can cite you to many, many instances in the complaint where with respect to Marsh or any other enterprise, the complaint alleges pro-competitive justifications. It shows competition. It shows the brokers using these conflicting incentives to play one insurer off the other. It shows brokers moving business from one strategic partner to another. That's probably a level of detail that isn't the best use of my time, but a review of the complaint will show all of those things. Now, Ms. Merriweather did point out, isolate out HRH, the only other one of these broker-centered conspiracies that she identified. HRH was a very small broker, and it decided that it was going to consolidate most of its business among three different insurers. That was HRH's unilateral decision. It was absolutely entitled to do that. Each of the three insurers that got the benefit of this arrangement knew about each other, absolutely. There is not a single allegation in the complaint or the revised particularized statement that shows a horizontal agreement among those three. HRH is just like a distributor deciding ex ante whether to grant certain producers exclusive distribution agreements or preferred provider arrangements on certain products. These kinds of vertical arrangements are common in all walks of business. They are never judged under a per se standard. They often have pro-competitive benefits. And I think it's important. In a sense, HRH, where you've got one broker sending its business to any one of three competitors, even if there were no competitive bidding among HRH's insurers, which the complaint alleges that there is, even if there weren't any, that would be a violation of the Sherman Act. It certainly wouldn't be a per se violation of the Sherman Act. The Sherman Act doesn't require competitive bidding. Under the Sherman Act, you can have, I don't know, let's say federated department stores, which owns many different lines of department stores. It's got 300 shirt manufacturers, and it decides, well, I want to see what the shirt manufacturers are going to pay me to sell their shirts in my stores. It can decide, well, you know, in Macy's, I'm going to sell these three kinds of shirts. And in Saks, I'll sell these three kinds of shirts. And I may change which ones I sell based on the kind of contingent commissions or incentives that I'm provided by the suppliers. In essence, what HRH shows, reveals, is very much like what you had in Twombly, three different, in this case, three different insurance companies, you know, but with the added element of a horizontal dictator. That is, in Twombly, you just had four or five incumbent telephone companies, each operating in its own territory and not competing in anybody else's territory. And the Supreme Court said, well, that simply makes economic sense, unless you can allege some fact that would tend to disprove that and show that there was a conspiracy. Here, you not only have that, we have three insurers that have bid to become the preferred providers. The broker is sending them their business, and they are making money by virtue of paying the contingent commissions to get this. And, again, no allegation here or anywhere else in the complaint about horizontal agreements. Okay, a few words about McCarran Ferguson. Judge Hochberg held that these, the complaint didn't implicate the business of insurance, but that was wrong. This is a case that directly concerns the allocation of policyholders' business in a manner that, according to the plaintiffs, substantially affected the terms of the policies and subverted the fiduciary relationship between insurers and brokers. This is a complaint, I mean, just to step back and look at this. This is a complaint brought by insurers. It is brought against insurers and brokers, nobody else in the case. The complaint is we paid, we were required to pay too much for our policies in order to transfer our risk. We had the terms of the risk transfer were changed, and there were these contingent commission preferred provider incentives that were not disclosed to us. So our fiduciary, whatever fiduciary duties were owed to us was violated. And the contracts, the contracts transferring risk, were steered not according to what was the best amount of coverage at the best price for us, but according to this allegedly conspiratorial arrangement between brokers and insurers as to what would make them the most amount of money. I mean, if this is not the business of insurance, I don't know what is. And it seems just as straightforward as that to me, and that's an alternative ground for affirmance. Judge Hochberg ruled against us. Judge Brown simply decided that under the law of the case he couldn't reexamine it. What was her theory? I've gone back and reread Judge Hochberg's decision on this several times, and I'm not sure that I can fairly explicate it, but I think what she was saying was this doesn't meet two of the three perennial factors to my satisfaction, and therefore I'm going to allow the complaint to proceed. I think she proceeded from an assumption that because the Supreme Court in Royal Drug decided that McCarran Ferguson wasn't implicated, even though there might be some price effect on the insurance policies ultimately, therefore the direct price effect alleged here wouldn't satisfy it. Now, in Royal Drug, just to remind the Court, Royal Drug was a health insurance plan, and it offered its insureds a $2 prescription plan. You pay $2 to get any prescription so long as you go to a pharmacy that participates in the plan. It was litigation between the plan and pharmacies that weren't participating, and that was the litigation in question. And an argument was made in that case that, well, you know, if not enough, you know, this is the business of insurance because it has to do with third party providing services through an insurance company to an insured, and the Supreme Court of the United States said, no, it's not. Why? Because the insureds are, quote, indifferent. Same word that the Court used in Pereno. The insureds are going to get their prescriptions for $2 no matter what. They don't care whether there's some dispute between a few pharmacies and the health plan. And Judge Hochberg somehow took that as authority to reach the same conclusion here, but that's totally wrong because the gravamen of the complaint in this case is we're all being misled, we, the insureds, are all being misled, and we're having to pay inflated prices in order to spread our risk. Now, finally, as to RICO, Judge Brown was absolutely right in dismissing for yet a third time the RICO complaint in this case because with respect to the broker-centered enterprises, the complaint does not plausibly allege, under Twombly, either the enterprise element or the conduct element. And under CI, for the CIAB enterprise, it doesn't plausibly allege the element of through a pattern of racketeering activity. I think I can go through this reasonably quickly. The Supreme Court – let me step back and explain something. The Court is well aware, I'm sure, that the Supreme Court any day now will be rendering a decision in United States v. Boyle which seeks to explicate the perceived circuit split between this circuit and others on one hand and I believe the Second Circuit and others on the other hand as to the structure and distinctiveness prongs of the enterprise element of the RICO cause of action, and who knows how it will come out. Our briefs, Judge Brown's opinion, the plaintiff's briefs have all, I think, adequately explicated our positions under the RICO-Bennie standard. What I'd like to do, because I think although Boyle may very well change the vocabulary that is used to decide to adjudicate these enterprise allegations, I'd like to go back to what the Supreme Court said in Turquette, which nobody in Boyle is taking any dispute with, and just show as to the enterprise element why the failure here is so fundamental. The Supreme Court said in Turquette that a RICO enterprise must be a, quote, group of persons associated together for a common purpose. It must have an ongoing organization and the various associates must function together as a continuing unit. In other words, the constituent members of the enterprise must actually join and perceive themselves as joining with each other to form a team, the continuing unit or ongoing organization that is jointly together pursuing a common purpose. That forecloses all of these broker-centered RICO enterprises under Twombly. The facts that are alleged in this case don't show organizations. They show collections of bilateral contracts between brokers and mutually antagonistic insurers competing for the same business from those brokers. That is at a minimum an obvious alternative explanation that is not in any way refuted by the pleading of the complaint. The plaintiffs say, well, we've alleged all these facts. We have hundreds of pages and thousands of paragraphs of factual allegations. That's what makes this a better case than Twombly. In Twombly, the Supreme Court just looked at it and said, yeah, you're saying that, you know, all of the incumbent telephone companies are operating in the same way and they're not competing with each other and that must be because they've agreed to do so. But we know a little bit about economic reality and we know that they were probably just recalling the adage of one who lives by the sword. They were happy with the world they lived in and they continue to be happy with the world they live in and they don't have to pursue the marginal dollar if they don't think it would be in their economic interest to do so. This is a case in which we don't just have that. We have the insurers, their pleadings showing hundreds of these conflicting contingent commission agreements by which brokers are playing insurers against each other and deciding where to allocate risk and premium based on how the broker makes the biggest marginal dollar. So calling these things enterprises, calling these arrangements organizations is not a matter of pleading fidelity. It's a lawyer's contrivance and nothing more. Another way to look at the enterprise failing here is to take the following syllogism. We know that not every conspiracy is an enterprise. This court has said so and many others have. I mean, just because something is a conspiracy, I mean, a conspiracy is an agreement. An enterprise is an organization. So Proposition 1, not every conspiracy is an enterprise. Proposition 2, a rimless hub and spokes is not even a conspiracy. That's Kadiakos, that's this court's decision in Kemp. Here we have an alleged hub and spoke arrangement in which there is, for the reasons I've articulated under the Sherman Act, there is no plausible inference of a rim, that is, of horizontal understanding among the insurers. That being the case, they can't possibly all be working together in the same team to pursue a common purpose. So Judge Brown was correct in concluding that they had not adequately established under Twomley the enterprise element. He was also correct in finding in the alternative that as to the broker-centered enterprises, they failed to establish prong two of RICO, which is the conduct of an enterprise. They had to show, and I'm quoting the Supreme Court in Reeves now, facts showing that the defendants conducted or participated in the conduct of the enterprise's affairs, not just their own affairs. This court reiterated that lesson in Parise and in the University of Maryland case. But there are no facts alleged here that show that all of the things that the insurer employees were doing and the broker employees were doing was anything other than pursuing that company's interest in the context of these bilateral contracts that they were operating under. As Judge Brown said, the fact of a business relationship doesn't indicate the entities involved in a business interaction are operating a joint enterprise. Now, finally, with respect to the CIAB, the CIAB is a legitimate organization. There's no issue. Judge Brown didn't decide an issue of whether it was or wasn't an enterprise. He didn't address whether, you know, the Turcat-RICO benefactors were established. He assumed that this was like in Provenzano, which involved a union local, an organization that satisfied the enterprise standards. But quite correctly, he found that there was a failure to prove that the defendants conducted the affairs of the CIAB through a pattern of racketeering activity. They had to have shown, under Twombly standards, that they conducted the CIAB's affairs through a pattern of racketeering activity. Now, the single most damning fact in support of Judge Brown's conclusion is this. The third revised RICO case statement contains 47 pages listing racketeering acts and asserting that they form a pattern. You will not find anywhere on those 47 pages even a mention or suggestion of the CIAB. The racketeering activity that is alleged in the complaint in the RICO case statement are mailings made by individual brokers to individual insureds, individual insurers to individual insureds. They have nothing to do with the CIAB. And that defeats any possible attempt to adequately plead that the brokers and insurers conducted the affairs of the CIAB through a pattern of racketeering activity. I can go through the two-part test that this court showed, that this court laid out for that standard in Provenzano and demonstrate why that's the case. But I think Judge Brown did so satisfactorily, and my red light is on. I think we understand that. Let me ask, are there any questions? I've got one, two quick questions. Judge Fisher asked your opponent what the Marsh Settlement, how does that affect what we're doing? I agree with my opponent. I don't think it affects this at all. The money that comes out of the Marsh Settlement, the Marsh Settlement would be funded by money that Marsh paid the New York Attorney General. So it doesn't affect that. I guess it's revealing only in this sense. The lodestar figure that, I mean, we're here on a 12B6 motion. The third time there have been five opinions dismissing the complaint. But we have had years of expedited discovery in this case because Judge Hochberg allowed discovery to go forward, even while the motion they were allowed to replete and replete and replete and replete, largely because they told her at the outset, you know, discovery will show that the bid rigging that we've established by these individuals in March SS casualty, you know, we're going to show that it's much broader. But what the Marsh Settlement really reveals is how much money, how much time has been spent at this case, and we are still at the motion to dismiss. Their claimed lodestar just in March was $165 million in legal fees. There are many, many, many more defendants than plaintiffs, and we're the ones that have had to do the work. The defendant insurance companies have already spent well in excess of $200 million just on this to date. And unless this court affirms, two things are going to happen. One, we haven't had any expert discovery. Two, the class certification hasn't been decided, and the discovery that was conducted on class certification went only to the original complaint, not the amended complaint. And, and this is the key point, they say, well, Judge Brown didn't take, you know, Judge, whether these agreements were pro-competitive or anti-competitive and whether they were good for the insurers or bad for the insurers, that's all going to be adjudicated at the trial. That's not for the pleading stage. But if this, if they proceed on a per se violation, under a per se theory, evidence of pro-competitive benefits, evidence of reduced costs, increased costs, all of that stuff about, that would apply under the rule of reason is inadmissible. That's what the Supreme Court held in Topco, and this court has stated many times as well. If you buy their argument, we will, no court will ever hear the reasons why these contingent commission agreements were pro-competitive and in the long run lowered prices for customers because that is all irrelevant. Thank you. Any other questions? Mr. Waxman, thank you very much. Ms. Merriweather, I'm sorry, we have one more defendant here. Good, Mr. Shea. Good afternoon, Your Honor. Good afternoon. My name is Patrick Shea. I'm from the Law Firm of Paul Hastings, Shinofsky & Walker. I represent the Unum Group Defendants in the Employee Benefits Case, and I'm here on behalf of all appellees. And I join the arguments that Mr. Waxman has just finished making on behalf of the commercial case. There is a fair amount of overlap. I want to make only three points that are very specific to the Employee Benefits Case. Point number one, there is no bid rigging in the Employee Benefits Case. Just as Mr. Waxman indicated, in the commercial case, it's restricted to a single broker and a single line of insurance in a single city. We have none of that whatsoever in the Employee Benefits Case. At most, we have two allegations, sporadic though they be, that a broker acting unilaterally and vertically in agreement with an insurer either decided to ask an insurer to keep a low bid in place that the insurer otherwise was not interested in doing in order to keep another competitor out of the mix. That's a purely vertical discussion between a broker and an insurer, no indication that any other insurer even knew about it, let alone had any implicit agreement with it. And the other instance they throw out is an example where they say a broker got a low bid from a different insurer but because it didn't have a contingent commission arrangement with that insurer, elected not to submit it. There is, again, no indication of any horizontal agreement whatsoever with respect to insurers. And indeed, in that last example, one of the victorious insurers was Guardian, who is not even a defendant in this case. So we have no bid rigging. What that means is to try to infer a naked horizontal agreement of the sort that is per se unlawful, you have to try and rely on all the facts that Mr. Waxman just showed is insufficient under Twombly to demonstrate that. In particular, it doesn't work in the employee benefits context. Two aspects about the employee benefits context include the fact that there is a strong independent basis for any employee benefits insurer to want to enter into one of these contingent arrangements with a broker. And the reason for that is, as plaintiffs allege in their complaint, these products are very complex and we have a highly fragmented market. If you want a broker to come in and learn your products, study your products, understand why they're best for their customers, you're going to have to fairly compensate that broker to in essence make them part of your sales force under those circumstances. In that particular situation, particularly in this marketplace, you have a strong pro-competitive incentive as an insurer to try and become a preferred provider of one of these brokers. In addition to that, Ms. Merriweather also complained about first looks and last looks and suggested that that was somehow inappropriate or an incumbent protection bracket. That clearly doesn't work in the employee benefits context because, again, we're not dealing with just somebody's automobile insurance policy. If you decide to displace an incumbent who is a health insurer and you are an employer, that is a big deal. It means taking some very sensitive medical records protected by HIPAA and figuring out how to move them from one insurer to another. It means explaining to your employees that now they're going to have to get new medical cards with potentially different types of coverages and maybe not be able to see their own doctors. So in a situation in which a broker decided, I am going to go out and I'm going to bid this case, I'm going to use that to get the best price for the customer, and then I'm going to go back and give the incumbent a last look so I don't have to move it, is a classic example how you can have a pro-competitive aspect for this. In any event, what we have here are purely vertical arrangements that have pro-competitive benefits. And there is absolutely no basis on which you can infer a horizontal naked restraint that would violate the very narrow range of conduct that falls within the per se prohibitions of the antitrust laws. What you're saying is the last look is intended to or may be intended to reduce the bid rather than to require that it be bigger. It absolutely does, Judge Greenberg. In fact, it gives the customer the best of both worlds because it uses the other insurers to drive down the price but doesn't force the employer to have to switch insurers with all the attended difficulties I just alluded to. The second point I want to make with respect to the employee benefits cases, there is a separate conspiracy alleged in the employee benefits case that's not in the commercial case. But you might use it, though, where I can understand the complexity in which you describe the switching of insurers. I understand that. But you might use it for the purpose, though, of protecting the original insurer so that the original insurer and employee are better not to stick to that price anymore or I'd love to but I'm going to lose the business. That's all right, isn't it? Indeed, that kind of vertical arrangement takes place every day in our economy. It's called competition. And people make vertical arrangements, you know, to use the beer distributor example, I might decide that I'm exclusively going to carry Budweiser because it's a great product and because I'm going to get some special advantages from that. There is nothing that is per se unlawful about that. That's the antithesis of the horizontal arrangements that are naked restraints that have been condemned. So my second point was to address the so-called global conspiracy. There was an allegation that all 52 separate defendants on the employee benefit side, 29 brokers, 23 insurers, all globally conspired not to disclose contingent compensation and in particular in connection with Form 5500, which is part of the ERISA reporting requirements that are out there. The facts actually alleged in the complaint belie that allegation because far from showing any uniform agreement or uniform pattern of nondisclosure, they show precisely the opposite. With respect to Cigna, it shows that in 2003 they were reporting them and then they briefly decided not to report them and then in 2004 they went back to reporting them. With respect to the Hartford, it shows that they were taking their contingent compensation and reporting them across their entire portfolio.